**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **ASHLEY NICHOLE MAGALLAN, individually, and as surviving spouse and next friend of Jesus Magallan, Jr., deceased,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 16-CV-0668-CVE-FHM** |
| **ZURICH AMERICAN INSURANCE COMPANY,** | ) | |
| **Defendant,** | ) | |
| **and** | ) | |
| **ZURICH AMERICAN INSURANCE COMPANY,** | ) | |
| **Third-Party Plaintiff,** | ) | |
| **v.** | ) | |
| **WYOMING CASING SERVICE, INC.,** | ) | |
| **Third-Party Defendant.** | ) | |

**OPINION AND ORDER**

Now before the Court are Ashley Nichole Magallan's (Magallan) motion for partial summary judgment (Dkt. # 74), and Zurich American Insurance Company's (Zurich) motion for summary judgment (Dkt. # 80). In order to fully address Zurich's motion (Dkt. # 80), the Court must first rule on Zurich's Daubert[1] motion regarding plaintiff's proposed expert Diane Luther (Dkt. # 85).

---

[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

## I.

This case arises from an automobile accident that resulted in the death of Magallan's husband, Jesus Magallan, Jr. Dkt. # 2-1, at 6. Magallan is, and Jesus Magallan, Jr. was, a resident of Texas. On February 17, 2015, Jesus Magallan, Jr. and Pedro Ochoa were passengers in a pickup truck being driven by Robert Kirk and owned by Wyoming Casing Service, Inc. (Wyoming Casing). Dkt. # 74, at 12-13; Dkt. # 80, at 5. All three men were employees of Wyoming Casing, and were acting within the scope of their employment. Dkt. # 74, at 13; Dkt. # 80, at 5. Wyoming Casing is a North Dakota corporation, with its principal place of business in North Dakota. The pickup truck was involved in an automobile accident with another vehicle in Freedom, Oklahoma, resulting in injuries to Ochoa and Kirk and the death of Jesus Magallan, Jr. Dkt. # 74, at 13; Dkt. # 80, at 5. Zurich determined that Kirk caused the accident by turning in front of the other vehicle. Dkt. # 80-2, at 2. Magallan does not now dispute that Kirk caused the accident. Dkt. # 80, at 5; Dkt. # 93, at 10. At the time of the accident, Wyoming Casing had purchased workers' compensation insurance and business automobile insurance policies issued by Zurich or its affiliate.[2] Dkt. ## 71-12, 80-5. Zurich is an Illinois corporation, with its principal place of business in Illinois.

The named insured of the business automobile insurance policy is Wyoming Casing, and the policy period is September 1, 2014 to September 1, 2015. Dkt. # 80-4. The policy includes a business auto coverage form that describes Wyoming Casing's "covered autos liability" coverage. Dkt. # 80-5. The business auto coverage form states that Zurich "will pay all sums an 'insured'

[2] It appears from the summary judgment record that Zurich issued the business automobile insurance policy, but a separate affiliated entity, American Zurich Insurance Company (which is not a party to this action), issued the workers' compensation policy. Dkt. # 93, at 10.

legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" Dkt. # 80-5, at 2. According to the policy's declarations, "any auto" is covered under the covered autos liability coverage. Dkt. # 80-4, at 2; Dkt. # 80-5, at 1. The business auto coverage form includes sections titled "Who Is An Insured" and "Exclusions." Dkt. # 80-5, at 2-3. Three exclusions are relevant to this case. First, the workers' compensation exclusion, which excludes "[a]ny obligation for which the 'insured' or the 'insured's' insurer may be held liable under any workers' compensation . . . law." Id. at 3. Second, the employee indemnification and employer's liability exclusion, which excludes bodily injury to an employee that "aris[es] out of and in the course of . . . [e]mployment by the 'insured.'" Id. at 4. Third, the fellow employee exclusion, which excludes bodily injury to "[a]ny fellow 'employee' of the 'insured' arising out of and in the course of the fellow 'employee's' employment." Id.

The business automobile insurance policy contains several endorsements, three of which are relevant to this case: the Oklahoma uninsured motorists (UM) coverage endorsement (Dkt. # 80-6), the auto medical payments coverage endorsement (Dkt. # 80-7), and the broadened coverage for named individuals endorsement (Dkt. # 80-10). The UM endorsement has a coverage limit of $1,000,000 "per accident." Dkt. # 80-6, at 1. In addition, it states that it modifies the business auto coverage form, and the provisions of that coverage form apply unless modified by the UM endorsement. Id. According to the UM endorsement, Zurich "will pay, in accordance with Title 36, Oklahoma Statutes, all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'uninsured motor vehicle.'" Id. at 1. The endorsement defines "uninsured motor vehicle" as a land motor vehicle or trailer:

a. For which no liability bond or policy at the time of an 'accident' provides at least the amounts required by the applicable law where a covered 'auto' is principally garaged;

b. That is an underinsured motor vehicle. An underinsured motor vehicle is a motor vehicle or 'trailer' for which there is a liability bond or policy at the time of an accident, the liability limits of which are less than the amount of the claim of the person or persons making such a claim, regardless of the amount of coverage of either of the parties in relation to each other;

c. For which an insuring or bonding company denies coverage or is or becomes insolvent; or

d. That is a hit-and-run vehicle and neither the driver nor owner can be identified.

Id. at 4. The UM coverage endorsement also contains sections titled "Who Is An Insured" and "Exclusions." The UM endorsement states that "[a]nyone 'occupying' a covered 'auto'" is an insured. According to the business auto declarations, only automobiles owned by Wyoming Casing are "covered autos" under the UM endorsement. Dkt. # 80-4, at 2; Dkt. # 80-5, at 1. It is undisputed that Magallan, Kirk, and Ochoa were defined first party insureds under the UM endorsement, as they were occupants of a covered auto. Dkt. # 80-6, at 1-2. The UM endorsement lists five exclusions to the coverage. The most relevant to this case is the direct or indirect benefit exclusion, which states that UM coverage "does not apply to . . . [t]he direct or indirect benefit of any insurer or self-insurer under any workers' compensation . . . law." Id., at 2.

The auto medical payments endorsement also modifies the business auto coverage form. Dkt. # 80-7, at 1. This endorsement states that Zurich "will pay reasonable expenses incurred for necessary medical and funeral services to or for an 'insured' who sustains 'bodily injury' caused by 'accident.'" Id. The auto medical payments endorsement contains an employee bodily injury exclusion, which excludes any bodily injury to an employee "arising out of and in the course of employment by [Wyoming Casing]." Id.

The broadened coverage for named individuals endorsement also modifies the business auto coverage form. Dkt. # 80-10, at 1. This endorsement states that the following is added to the "Who Is An Insured" sections of the UM and auto medical payments endorsements: "[a]ny individual named in the Schedule and his or her 'family members' are 'insureds' while 'occupying' or while a pedestrian when being struck by any 'auto' you don't own except . . . [a]ny 'auto owned by that individual or by any 'family member.'" Id. at 2. The individuals listed in the schedule are Steve Halvorson and Londa Halverson.[3] Steve Halvorson is the owner and president of Wyoming Casing. Dkt. # 80, at 22.

After the automobile accident, Magallan, individually and as surviving spouse of Jesus Magallan, Jr., filed a first party UM claim with Zurich on or about July 7, 2015. Id.; Dkt. # 93, at 10. Zurich denied her UM claim on or about February 8, 2016. Dkt. # 80, at 6; Dkt. # 93, at 10. Magallan also filed a workers' compensation claim in Oklahoma on December 7, 2015. Dkt. # 80, at 5. Magallan was awarded benefits for her workers' compensation claim in June 2016. Id. Magallan filed this suit in Delaware County District Court on October 3, 2016. Dkt. # 2-1, at 1. Her petition alleges claims for breach of contract, bad faith, and declaratory relief against Zurich, and negligence and wrongful death against John Christopher Crelia, the driver of the other automobile involved in the accident.[4] Id. The suit was filed in Delaware County because Crelia was at the time a resident there. Zurich removed the suit to this Court (Dkt. # 2) and filed a counterclaim (Dkt. # 11) against Magallan and a third-party complaint (Dkt. # 15) against Wyoming Casing, both seeking

---

3 There appears to be at least one spelling error in the names of the individuals listed in the schedule. The names here reflect their spelling on the endorsement. See Dkt. # 80-10, at 1; Dkt. 80, at 22 n.2.

4 All claims against Crelia were dismissed with prejudice on August 4, 2017. See Dkt. # 83.

declaratory judgment regarding Zurich's obligations under the business automobile insurance policy.[5]

Paula Nevin is the Zurich claims handler who processed Magallan's UM claim. Dkt. # 80, at 13. Prior to writing her denial letter, in addition to her investigation, Nevin reviewed the claims file and business automobile insurance policy, and requested and received the Oklahoma workers' compensation statute from one of Zurich's Oklahoma lawyers. Her denial was approved by her team manager, who was designated within Zurich as a "coverage champion," or expert. Dkt # 93, at 17. She did not, however, seek the advice of an Oklahoma attorney, or ask Zurich's underwriting department for a coverage opinion. Id.

Nevin's denial letter–which can only be described as convoluted–lists a mix of policy exclusions as the bases for denying Magallan's claim, including: (1) workers' compensation is the exclusive remedy for auto liability and medical payments coverage; (2) auto liability and medical payments coverages do not apply to workers who suffer bodily injury caused by a fellow employee in the course of employment; (3) Crelia was not at fault, so Magallan is not entitled to UM coverage; and (4) Magallan is also not entitled to UM coverage because any award would benefit an insurer under Oklahoma's workers' compensation laws. Dkt. # 74-4. Importantly, although she does not explain this in her letter, Nevin never considered whether Magallan might be entitled to UM coverage as against Kirk, who was an insured under the policy and at fault for the accident, but excluded from liability under the fellow employee exclusion. At her deposition, Nevin explained

---

[5] Wyoming Casing filed a third-party counterclaim (Dkt. # 57) against Zurich, seeking to enforce a right of subrogation under Okla. Stat. tit. 85A, § 43(B)(4). This counterclaim is the subject of Wyoming Casing's motion for summary judgment (Dkt. # 81), which will be addressed in a separate opinion and order.

that she did not consider Kirk uninsured or underinsured, despite the fact that Magallan was precluded from recovering against him. Dkt # 74-2, at 34-35.

**II.**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Id. at 327 (quoting Fed. R. Civ. P. 1).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that the party must prevail as a matter of law." Id. at 251-52. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

"The interpretation of an insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state." Hous. Gen. Ins. Co. v. Am. Fence Co., Inc., 115 F.3d 805, 806 (10th Cir. 1997) (applying Oklahoma law). In Oklahoma, interpretation of an insurance contract is a matter of law. Max True Plastering Co. v. U.S. Fid. and Guar. Co., 912 P.2d 861, 869 (Okla. 1996). The insured has the burden of showing that his or her claim is covered under the policy. See U.S. Fid. and Guar. Co. v. Briscoe, 239 P.2d 754, 756 (Okla. 1952) (noting that "the contractor must bring himself within the terms of the policy, before he can establish insurer's liability thereon"); see also Pitman v. Blue Cross and Blue Shield of Okla., 217 F.3d 1291, 1298 (10th Cir. 2000) (explaining that, under Oklahoma law, "the insured has the burden of showing that a covered loss occurred"). Once the insured establishes coverage, "the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy." Pitman, 217 F.3d at 1298. Therefore, summary judgment in favor of the insurer is proper when the undisputed facts show that the insured has failed to establish a covered claim under its insurance policy. See, e.g., VBF, Inc. v. Chubb Grp. of Ins. Cos., 263 F.3d 1226 (10th Cir. 2001) (affirming the district court's grant of summary judgment to the insurers where the undisputed facts established that, under Oklahoma law, the insured's claims were not covered). Conversely, summary judgment in favor of the insured is proper when the undisputed facts show the insured has established a covered claim. See id.

**III.**

Magallan and Zurich have filed cross-motions for summary judgment regarding Magallan's breach of contract claim. Dkt. ## 74, 80. Zurich also seeks summary judgment on Magallan's bad faith claim and request for punitive damages. Dkt. # 80, at 23-28. In response to Zurich's motion, plaintiff relied in its response on an affidavit of her proposed expert Diane Luther (Dkt. # 93-4). Although Zurich did not file a motion to strike the affidavit, it did file a Daubert motion to exclude her testimony (Dkt. # 85). To determine if the Court may consider that affidavit in ruling on summary judgment, it must resolve Zurich's Daubert motion (Dkt. # 85) seeking to exclude the testimony of the expert.

**A.**

Magallan argues that she is entitled to recover on her UM claim under the unambiguous terms of the insurance policy. Zurich argues that the unambiguous language of the policy excludes Magallan's UM claim. In interpreting the policy, the Court applies the Oklahoma rules of construction. See VBF, Inc., 263 F.3d at 1230. Under Oklahoma law, an insurance contract should be construed according to the terms set out within the four corners of the document. First Am. Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1173 (10th Cir. 2005); Redcorn v. State Farm Fire & Cas. Co., 55 P.3d 1017, 1020 (Okla. 2002); London v. Farmers Ins. Co., Inc. 63 P.3d 552, 554 (Okla. Civ. App. 2002). If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." Roads West, Inc. v. Austin, 91 P.3d 81, 88 (Okla. Civ. App. 2003). Ambiguities in an insurance contract are construed against the insurer. Max True, 912 P.2d at 865. A court should not create an ambiguity in the policy by "using a forced or strained

construction by taking a provision out of context, or by narrowly focusing on a provision." Wynn v. Avemco Ins. Co., 963 P.2d 572, 575 (Okla. 1998). A policy term will be considered ambiguous only if it can be interpreted as having two different meanings. Equity Ins. Co. v. City of Jenks, 184 P.3d 541, 544 (Okla. 2008); Osprey L.L.C. v. Kelly-Moore Paint Co., 984 P.2d 194, 199 (Okla. 1999). However, the Oklahoma courts "will not impose coverage where the policy language clearly does not intend that a particular individual or risk should be covered," and neither a "split in authority over whether a certain term is ambiguous," nor "the fact that the parties disagree" alone is sufficient to establish an ambiguity. BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co., 148 P.3d 832, 835-36 (Okla. 2005).

Jesus Magallan, Jr. was an insured under the definition contained in the UM endorsement, because it is undisputed that he was a passenger in a vehicle owned by Wyoming Casing when the accident occurred. Moreover, it is undisputed that Kirk caused the accident. The vehicle Kirk was driving is an underinsured motor vehicle under the policy because there was liability insurance for the vehicle under the Wyoming Casing business automobile policy, but the liability insurance precludes a claim by Magallan because Jesus Magallan, Jr. was a fellow employee of Kirk. See Dkt. # 80-5, at 2-4. Therefore, Magallan is entitled to recover on her UM claim unless it is excluded. Zurich argues that five exclusions in the policy preclude Magallan's UM claim: (1) the workers' compensation exclusion in the business auto coverage form, (2) the employee indemnification and employer's liability exclusion in the business auto coverage form, (3) the fellow employee exclusion in the business auto coverage form, (4) the employee bodily injury exclusion in the auto medical payments endorsement, and (5) the direct or indirect benefit exclusion in the UM endorsement. Dkt. # 80, at 14.

**i.**

The first three exclusions that Zurich asserts apply to Magallan's UM claim are found in the business auto coverage form. Dkt. # 80-5). Zurich argues that these exclusions apply because the business auto liability exclusions apply to all claims and that the UM endorsement exclusions supplement the business auto liability exclusions. Magallan argues that the business auto liability exclusions do not apply here because the UM endorsement exclusions supplant the business auto liability exclusions for UM claims. The Court agrees with Magallan; Zurich's interpretation of the policy is unsupportable as a matter of contract law.

First, the structure of the policy indicates that the business auto liability exclusions apply only to liability coverage (as opposed to UM coverage). The business auto liability exclusions are contained in "Section II – Covered Autos Liability Coverage." The section is divided into three subsections: "Coverage," which includes a description of the auto liability coverage and "Who Is An Insured"; "Exclusions"; and "Limit of Insurance." See Dkt. # 80-5, at 2-6. The UM endorsement is structured in a similar manner, with sections for "Coverage," "Who Is An Insured," "Exclusions," "Limits Of Insurance," "Changes of Conditions," and "Additional Definitions." See Dkt. # 80-6. Because the policy is structured so that the exclusions appear separately under each type of insurance coverage, the logical interpretation is that the exclusions apply only to the insurance coverage under which they are listed. This distinction is reinforced by the fact that these are entirely different types of insurance. Liability coverage provides compensation to third parties on behalf of the insured for damage and injuries incurred when the insured driver is at fault. See 6 New Appleman on Insurance Law Library Edition § 61.03[2] (Jeffrey E. Thomas ed., 2017). Whereas

UM coverage provides compensation to the insured for damage and injuries incurred when an uninsured or underinsured motorist is at fault. See id. at § 61.03[3].

Second, if the business auto liability exclusions are applied to UM claims, it would violate the well established rule that contracts should be read to give meaning to each provision. See BP Am., 148 P.3d at 835; see also Appleman § 5.03[1] ("To the extent an interpretation makes another term or provision meaningless, that interpretation should be rejected in favor of an interpretation that preserves meaning."). Both the business auto liability form and UM endorsement contain identical exclusions for bodily injuries arising out of war, other military action, or government insurrection. See Dkt. # 80-5, at 5; Dkt. # 80-6, at 2. If the UM endorsement exclusions are supplemental to the business auto liability exclusions, then the war exclusion in the UM endorsement would be meaningless.

Third, the UM endorsement states that it modifies the business auto coverage form. In Edens v. The Netherlands Insurance Co., 834 F.3d 1116 (10th Cir. 2016), the Tenth Circuit addressed the meaning of "modifies" in an insurance policy governed by Oklahoma law where there is a UM endorsement that modifies a business auto coverage form. The Tenth Circuit stated that "[b]ecause the Business Auto Coverage Form never provides UM coverage, the Oklahoma Uninsured Motorists Coverage endorsement's UM coverage is independent from the Policy's liability coverage." Id. at 1121 n.2 (emphasis added). The same is true here; the business auto coverage form does not provide UM coverage, and the UM endorsement adds to the policy an additional type of coverage, UM coverage, that is independent from the liability coverage contained in the business auto coverage form.

For the reasons above, the Court finds that the workers' compensation exclusion in the business auto coverage form, the employee indemnification and employer's liability exclusion in the business auto coverage form, and the fellow employee exclusion in the business auto coverage form (Dkt. # 80-5), do not exclude Magallan's UM claim.

**ii.**

Zurich argues that the employee bodily injury exclusion in the auto medical payments endorsement (Dkt. # 80-7) excludes Magallan's UM claim. For reasons similar to those discussed above with regard to the business auto liability exclusions, the exclusions in the auto medical payments coverage endorsement do not apply to a UM claim. This endorsement sets out a separate type of insurance with listed exclusions in the same manner as the business auto liability and UM coverage. Additionally, the auto medical payments endorsement has the same war exclusion as both the business auto liability form and the UM endorsement that would be meaningless if the auto medical payments endorsement exclusions were read to supplement the UM endorsement exclusions. Thus, the employee bodily injury exclusion in the auto medical payments endorsement (Dkt. # 80-7) does not exclude Magallan's UM claim.

**iii.**

Zurich asserts that the direct or indirect benefit exclusion in the UM endorsement excludes Magallan's UM claim. This exclusion states that UM insurance does not apply to "[t]he direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability benefits or similar law." Dkt. # 80-6, at 2. Though its briefing on this issue is tangled and lacks clarity, the Court understands Zurich to be arguing that this exclusion applies to Magallan's UM claim because Oklahoma law provides that "[a]n employer or carrier who is liable for compensation under [the

workers' compensation] act...shall be entitled to maintain a third-party action against the employer's uninsured motorist coverage." Okla. Stat. tit. 85A, § 43(B)(4). In other words, Zurich implies that, because in Oklahoma a workers' compensation carrier is entitled to subrogation against a UM carrier, the direct or indirect benefit exclusion applies to Magallan's UM claim, as American Zurich would presumably have a subrogation claim against–and thereby benefit from–any UM coverage. But it is axiomatic that "'insurance policy clauses that are contrary to a provision of a statute are void as against public policy.'" Etherton v. Owens Ins. Co., 829 F.3d 1209, 1225 (10th Cir. 2016) (quoting Aetna Cas. & Sur. Co. V. McMichael, 906 P.2d 92, 101 (Colo. 1995)). And the direct or indirect benefit exclusion Zurich points to–written on a policy form from 2012–is therefore unenforceable insofar as it is inconsistent with § 43(B)(4), since it effectively could negate the subrogation right against UM coverage that the statute explicitly gave employers and workers' compensation carriers in 2013 (effective 2014).[6]

**iv.**

Zurich also argues that the broadened coverage for named individuals endorsement (Dkt. # 80-10) demonstrates the parties' intention to deny UM coverage to anyone other than Steve Halvorson and Londa Halverson, the named individuals in that endorsement. As the named individuals are Wyoming Casing employees, Zurich asserts that Wyoming Casing employees must not be covered under the UM endorsement. Dkt. # 80, at 22-23.

---

[6] The Court notes that, here, it offers no opinion on whether or not Zurich, or any other party in this case, has a valid subrogation claim against any UM award Magallan may receive as a result of this opinion and order and jury verdict. The Court will treat the issue of the parties' subrogration rights in a separate opinion and order ruling on Wyoming Casing's motion for summary judgment. See Dkt. # 81.

Zurich mischaracterizes what coverage is added by the broadened coverage for named individuals endorsement. The endorsement adds UM coverage for the named individuals and their family members when occupying any automobile not owned by Wyoming Casing. See Dkt. # 80-10. The UM coverage provided by the UM endorsement includes anyone occupying an automobile owned by Wyoming Casing. The broadened coverage for named individuals endorsement is not an indication that Wyoming Casing employees are not covered under the UM endorsement; instead, for certain individuals it broadens the UM coverage already available under the UM endorsement to include vehicles not owned by Wyoming Casing. Thus, the broadened coverage for named individuals endorsement (Dkt. # 80-10) does not show that the parties intended to deny UM coverage to anyone other than the named individuals.

**v.**

Finally, Zurich argues that Torres v. Kansas City Fire & Marine Insurance Co., 849 P.2d 407 (Okla. 1993), in which the Oklahoma Supreme Court held that the exclusivity provision of Oklahoma's workers' compensation laws do not bar simultaneous recovery under a UM policy, does not control here. Dkt. # 80, at 13-20. Oklahoma law generally requires automobile insurance policies to include uninsured motorist coverage. Okla. Stat. tit. 36, § 3636. In describing the uninsured motorist coverage required by § 3636, the statute states that coverage shall be provided for those "entitled to recover damages from owners or operators of uninsured motor vehicles..." Id. Torres is one in a long line of cases in which the Oklahoma Supreme Court interpreted the meaning of "legally entitled to recover." See Torres, 849 P.2d at 410-11 (chronicling previous cases interpreting the phrase). The defendant in Torres argued that the plaintiff could not recover under the uninsured motorist policy because the driver at fault was immune from liability by virtue of the

exclusivity provisions of the workers' compensation laws. Id. at 409. Thus, the defendant argued, the plaintiff was not "legally entitled to recover" under § 3636 because he was not legally entitled to recover damages from the tortfeasor. Id. The Oklahoma Supreme Court disagreed with the defendant and held that the exclusivity provisions of the workers' compensation laws do not bar recovery under an uninsured motorist policy. Id. at 412. The Oklahoma Supreme Court explained that it was following its previous cases by holding that "[t]he worlds 'legally entitled to recover' simply mean that the insured must be able to establish fault on the part of the uninsured motorist which gives rise to damages and prove the extent of those damages." Id. At 410 (quoting Uptegraft v. Home Ins. Co., 662 P.2d 681, 685 (Okla. 1983)).

In support of its argument that Torres does not control the instant matter, Zurich gives the following four reasons, all of which are unpersuasive:

First, Zurich argues that plaintiff in Torres was an insured under the UM policy, whereas Magallan is not. As concluded above, however, Magallan is a defined first party insured under the UM policy ("occupant of a covered auto").

Second, Zurich argues that Torres addressed coverage pursuant to Okla. Stat. tit. 36, § 3636, which requires auto insurance policies to generally include UM endorsements, and that Wyoming Casing is exempt from this requirement as a motor carrier under Okla. Stat. tit. 36, § 3637. This is a red herring. Wyoming Casing chose to purchase a UM policy, so whether it is exempt from the requirements of § 3636 is irrelevant. The UM policy governs.

Third, Zurich argues that because the Administrative Workers' Compensation Act, Okla. Stat. tit. 85A, § 1 et seq. (AWCA) was amended in 2013, it is uncertain whether the holding in Torres still applies. Yet Zurich provides no support for this assertion. Torres interprets § 3636, not

the workers' compensation laws. Torres is one case in a line of cases holding that issues that would bar recovery directly from a tortfeasor will not bar recovery under a UM policy. This line of cases is not exclusive to workers' compensation. See Torres, 849 P.2d at 410-11 (discussing prior cases interpreting "legally entitled to recover"). Because Torres is an interpretation of the law requiring UM coverage, it is unlikely a change in the workers' compensation law would alter the outcome.

Fourth, Zurich argues that Torres does not extend to the situation before the Court, as the Oklahoma Supreme Court in Torres noted, "[w]e do not have here any issue of whether an employer's commercial fleet policy containing an UM endorsement could be written so as to define the term insured to totally exclude the employer's employees or to exclude employees in certain situations from the definition of insured. Such an issue is not before us and we express no opinion on it." Torres, 849 P.2d at 412, n. 6. But, exactly as in Torres, the Court here is not faced with the issue of whether an employer's commercial fleet policy containing an UM endorsement was written so as to define the term insured to totally exclude the employer's employees or to exclude employees in certain situations from the definition of insured. As found herein, the Zurich business auto policy was not written to exclude employees totally or in certain situations from the definition of insured in the UM endorsement.

Accordingly, Zurich's arguments that Torres does not govern the instant matter are meritless, and the Court concludes, under Torres, that the Oklahoma's workers' compensation exclusivity provision is not a barrier to Magallan receiving the UM benefits under Zurich's policy.

**B.**

Zurich argues that it is entitled to summary judgment on Magallan's claims for bad faith and punitive damages. Dkt. # 80, at 23-28. In response to that motion, Magallan submitted an affidavit

of Diane Luther, a proposed expert on claims handling. Dkt # 93-4. Although Zurich did not file a motion to strike the affidavit, it did thereafter file a Daubert motion seeking to exclude Luther's testimony. Dkt. # 85. The Court will first decide Zurich's Daubert motion before addressing its motion for summary judgment on Magallan's bad faith claim.

Plaintiff retained Luther as an expert to review the claims handling practices of Zurich in the context of her bad faith claim. Luther has been a licensed insurance adjuster in the state of Oklahoma since 1981, and she teaches continuing education courses for insurance adjusters and agents at Francis Tuttle Technology Center. Dkt. # 85-2, at 1. She states that she has reviewed approximately 700 to 800 insurance claim files working as a consultant, and she has given expert testimony in state and federal court. Id. Luther opines that the adjuster handling plaintiff's UM/UIM claim focused solely on Crelia's potential liability and failed to analyze Kirk's negligence, and she faults the adjuster and her supervisor for focusing solely on the language of the policy in denying plaintiff's UM/UIM claim. Id. at 12-13. Instead, Luther reached an opinion that plaintiff is entitled to UM/UIM benefits as a matter of Oklahoma law, and she states that the adjustor and her supervisor failed to seek the advice of an attorney. Id. at 12. Luther opines that the UM/UIM endorsement, rather than the provisions of the auto liability portion of the policy, govern plaintiff's UM/UIM claim, and the exclusions from other sections of the policy do not apply to a UM/UIM claim. Id. at 13. Luther sets forth what she believes would have been the proper analysis of plaintiff's UM/UIM claim. Id. at 14-18. She also reviewed Zurich's claim handling practices and states that Zurich has a policy of issuing a coverage decision within 30 days of receiving a claim. Id. at 18. Luther is critical of Zurich for taking almost a year to resolve plaintiff's UM/UIM claim, and she asserts that an insurance company can be held liable for bad faith as a matter of Oklahoma

law if it unreasonably delays in making a coverage decision or paying benefits.[7] Id. She claims that Zurich acted in bad faith due to its "woefully inadequate" claims analysis, and she opines that Zurich should have resolved the coverage issue and opened settlement negotiations within 30 days of receiving plaintiff's UM/UIM claim. Id. at 19. Luther believes that Zurich's failure to timely engage in settlement negotiations is also a violation of Oklahoma's Unfair Claims Settlement Practices Act, OKLA. STAT. tit. 36, § 1250.1 et seq. (UCSPA). Id.

Zurich has filed a motion challenging the qualifications of plaintiff's expert witness and the reliability of the methodology used by that expert to reach her opinions. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that district courts must initially assess the admissibility of "scientific" expert testimony under Fed. R. Evid. 702. The Supreme Court extended the gatekeeper role of federal district courts to all expert testimony in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In Bitler v. A.O. Smith Corp., 400 F.3d 1227 (10th Cir. 2005), the Tenth Circuit discussed the role of district courts in considering a Daubert challenge to the admissibility of expert testimony. First, the court should make a preliminary finding that the expert is qualified to testify. Id. at 1232-33. Next, the proponent of expert testimony must establish that the expert used reliable methods to reach his/her conclusion and that the expert's opinion is based on a reliable factual basis. Id. at 1233. The Tenth Circuit cited four factors that district courts should apply to make a reliability determination:

> (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or

---

[7] Luther calculates the period of time for her opinion as to delay from the date of the accident to the issuance of the denial letter. However, her report notes that plaintiff's counsel did not submit a claim for UM/UIM to Zurich until July 7, 2015, and the period of time from this letter to the denial is approximately seven months.

> potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

Id. at 1233 (citing Daubert, 509 U.S. at 593-94). The Tenth Circuit was clear that "a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." Id. In other cases, the Tenth Circuit has emphasized that any analytical gap in an expert's methodology can be a sufficient basis to exclude expert testimony under Daubert. Trucks Ins. Exchange v. MagneTek, Inc., 360 F.3d 1206, 1212-13 (10th Cir. 2004); Goebel v. Denver & Rio Grande Western R. Co., 346 F.3d 987, 992 (10th Cir. 2003). Under Daubert, "'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissable. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" Mitchell v. Gencorp Inc., 165 F.3d 778, 783 (10th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994)).

Zurich challenges the admissibility of Luther's proposed expert testimony on several grounds. Zurich argues that Luther should be prohibited from offering any opinions not contained in her expert report, because this would be a violation of Fed. R. Civ. P. 26. Dkt. # 85, at 17.[8] Zurich argues that Luther intends to offer opinions about claims handling practices that deviated from "industry standards," but that Luther's proposed testimony is unreliable due to her failure to

---

[8] Plaintiff's response (Dkt. # 97) misstates Zurich's argument as to Rule 26, and she argues that Luther's expert report fully complies with Rule 26. That is not what Zurich argues in its motion; Zurich seeks to preclude Luther from offering opinions that were not properly disclosed in her expert report. The law is clearly established that a district court may exclude specific opinions or bases for the expert's opinions that were not fairly disclosed in the expert's report. Keach v. United States Trust Co., 419 F.3d 626, 641 (7th Cir. 2005). At this point, it does not appear that Luther intends to offer opinions that were not contained in her expert report, but plaintiff is advised that Luther's expert testimony is limited to the opinions disclosed in her expert report. See Dkt. # 97, at 21 (plaintiff states that Luther does not intend to offer any opinion not disclosed in her expert report).

specifically identify the source of the industry standards. Id. at 20-21. Zurich also asks the Court to prohibit Luther from offering opinions as to issues of law and the ultimate issue of whether Zurich acted in bad faith. Id. at 27. Finally, Zurich asks the Court to exclude any testimony that Zurich allegedly violated the UCSPA, and it seeks to exclude Luther's testimony under Fed. R. Evid. 404(b).[9]

Zurich argues that Luther should be prohibited from offering any testimony at trial, because she has failed to identify the "industry standards" allegedly violated by Zurich that would support her opinions that Zurich improperly handled plaintiff's UM/UIM claim. Dkt. # 85, at 22. Zurich claims that Oklahoma law, not vague "industry standards," should be the standard by which its conduct is measured. Id. Plaintiff responds that Luther's opinions concerning industry standards and good claims handling practices are based on her training and experience, and Zurich's criticisms concerning the specific basis for her opinions goes to the weight of Luther's testimony. Dkt. # 97, at 20-21. Plaintiff argues that Luther's testimony will be helpful to the jury because Luther can offer an "insider's view" as to how an insurance claim should be handled. Id. at 24.

---

[9] Zurich argues that Luther should be prohibited from offering opinions that impugn the character of Zurich, because this is impermissible evidence of bad character under Rule 404(b). Dkt. # 28. As will be explained below, Luther will be prohibited from offering an opinion on the ultimate issue that Zurich acted in bad faith, but her opinions are not otherwise evidence of bad character merely because she is critical of Zurich's claims handling practices. The nature of the tort of bad faith is that an insurer acted in a manner that breached its obligation of good faith and fair dealing, and this can be shown by an "insurer's failure to follow judicial construction of contracts or available applicable law, as well as duties that are necessary for an insurer's timely determination of a claim." Brown v. Patel, 157 P.3d 117 (Okla. 2007). Luther may offer testimony that is critical of Zurich's claims handling practices in this case without violating Rule 404(b), because this is an essential element of plaintiff's bad faith claim.

The Court finds that Luther may testify about Zurich's claims handling practices based on her training and experience, and that Zurich's arguments concerning the industry standards relied upon by Luther go to the weight, rather than the admissibility, of Luther's testimony. Luther has been a licensed insurance adjuster since 1981 and she teaches continuing education courses for insurance adjustors and agents. Dkt. # 85-2, at 1-2. The Court has reviewed Luther's expert report, and she has clearly reviewed the claims file and has a sufficient factual basis to offer opinions about Zurich's handling of plaintiff's UM/UIM claim. Zurich is correct that Luther does not identify the specific source of her industry standards for claims handling, but she has extensive experience in the insurance industry and it is the type of experience that is relevant to offering opinions concerning proper claims handling procedures. See United States v. Nacchio, 555 F.3d 1234, 1258 (10th Cir. 2009) (expert witness' testimony can be based on experience if it is the right type of experience and supports a conclusion that an expert's opinion on a subject is reliable). Zurich may cross-examine Luther about the specific sources or publications stating the relevant industry standards, because this goes to the weight of her testimony. However, this is not a reason to wholly exclude Luther's testimony.

The Court finds that some limitations requested by Zurich on Luther's proposed expert testimony requested are appropriate. Under Fed. R. Evid. 702(a), expert testimony may be permitted if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." The Tenth Circuit has clarified that an expert may refer to the law or legal terms if it is necessary to understand the expert's opinions, but an expert may not attempt to define the law that a fact-finder must follow or "direct the jury's understanding of the legal standards upon which their verdict must be based . . . ." Specht v. Jensen,

853 F.2d 805, 810 (10th Cir. 1988). Luther is not a lawyer. Further, Luther cannot testify as to the legal parameters for bad faith as a matter of Oklahoma law, because it is the duty of the Court, not an expert witness, to instruct the jury as to the law. In addition, Luther will not be permitted to offer any opinion as to the ultimate conclusion that Zurich acted in bad faith. This would not be helpful to the jury and it would likely be prejudicial to defendant, because Luther would essentially be telling the jury what decision to reach on plaintiff's bad faith claim. O'Sullivan v. Geico Casualty Co., 233 F. Supp. 3d 917, 928 (D. Colo. 2017) (allowing expert to testify as to claims handling practices but excluding expert's opinion that the insurer acted in bad faith). As to Luther's opinion that Zurich violated the UCSPA, the sole basis for this opinion is that Zurich denied plaintiff's UM/UIM claim and plaintiff filed a lawsuit challenging Zurich's decision. Dkt. # 85-2, at 19. The Court finds that this opinion should be excluded, because Luther's legal conclusion that Zurich violated the USCPA would not be helpful to the jury in assessing whether Zurich acted in bad faith. A bad faith claim under Oklahoma law is not governed by the USCPA, and Luther's opinion on this issue is irrelevant and potentially confusing for the jury.

The Court finds that Zurich's motion (Dkt. # 85) to exclude Luther's testimony is granted in part and denied in part. Luther will be permitted to testify about Zurich's claims handling practices and applicable industry standards. However, she will be prohibited from testifying as to the ultimate conclusion that Zurich acted in bad faith by denying plaintiff's UM/UIM claim, and she will not be permitted to testify about Oklahoma law as to bad faith or the USCPA. Luther's affidavit in the summary judgment record (Dkt. # 93-4) does not contain legal conclusions. Further, the Court notes that Zurich has not filed a motion to strike Luther's affidavit submitted as a part of plaintiff's response to Zurich's motion for summary judgment. The Court will consider the affidavit.

**C.**

Zurich has moved the Court for summary judgment on plaintiff's bad faith claim and request for punitive damages. Dkt. #80, at 25-28. In her petition, plaintiff alleged bad faith on the grounds that Zurich unreasonably refused to award her UM benefits, failed to perform a proper investigation and evaluation of the investigation's results, negligently supervised her claim, and recklessly disregarded its duty to deal fairly and in good faith with her. Dkt. # 2-1, at 4-5. In its answer, Zurich denied all of plaintiff's allegations. Zurich moves for summary judgment on plaintiff's bad faith claim and request for punitive damages on the grounds that: (1) plaintiff's loss is not covered by the policy; (2) this suit constitutes a legitimate dispute as to whether UM coverage exists for plaintiff; and (3) Zurich's investigation and evaluation of the claim were reasonable under the circumstances. In response, plaintiff argues that Zurich is not entitled to summary judgment on her bad faith claim and request for punitive damages because there are fact issues as to whether (1) Zurich's denial was unreasonable, insofar as it was based on an inadequate investigation and evaluation of her claim; and (2) Zurich unreasonably delayed payment. Dkt. # 93, at 19-30. Based on these facts, plaintiff argues, a reasonable jury could conclude that Zurich acted with the reckless disregard necessary to justify punitive damages. Id. at 31.

In Oklahoma, an insurer "has an implied duty to deal fairly and act in good faith with its insured." Manis v. Hartford Fire Ins. Co., 681 P.2d 760, 761 (Okla. 1984). Where an insured breaches this duty, Oklahoma courts recognize a common law tort action for bad faith. Id. To satisfy all the elements of the tort, an insured must show: (1) that he was covered under the policy at issue, (2) the actions of the insurer were unreasonable in light of all the facts known or knowable concerning the claim at the time, (3) the insurer failed to deal fairly and act in good faith toward the

insured in handling the claim, and (4) the breach was the direct cause of any damages sustained by the insured. Brown v. Patel, 157 P.3d 117, 129 (Okla. 2007); Conti v. Republic Underwriters Ins. Co., 782 P.2d 1357, 1362 (Okla. 1989).

**i.**
**(Legitimate Dispute)**

An insurer "clearly has the right to resist payment [for] any claim to which the insurer has a reasonable defense." Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1009 (Okla. 1991). Accordingly, withholding payment or denying a claim on the basis of a legitimate coverage dispute is not, in and of itself, evidence of bad faith. By the same token, neither is the existence of a legitimate coverage dispute "an impenetrable shield against a valid claim of bad faith." Timberlake Const. Co. V. United States Fidelity & Guar Co., 71 F.3d 335, 343 (10th Cir. 1995). To rebut an insurer's defense of denying a claim based on a legitimate coverage dispute, the insured must present specific evidence of bad faith. Id. at 1442. "On a motion for summary judgment, the trial court must first determine, under the facts of the particular case and as a matter of law, whether the insurer's conduct may be reasonably perceived as tortious....Until the facts, when construed most favorably against the insurer, have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed." Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436-37 (10th Cir. 1993) (citing City Nat'l Bank & Trust Co. V. Jackson Nat'l Life Ins., 804 P.2d 463, 468 (Okla. App. 1990)).

One evidentiary route an insured may take to show that the insurers conduct was tortious, despite the existence of legitimate coverage dispute, is to show that the insurer performed an inadequate investigation or evaluation–i.e. that the insured overlooked or intentionally disregarded material facts, or that a more thorough investigation would have resolved the discrepancy. Oulds v.

Principal Mut. Life Ins. Co., 6 F.3d 1431, 1442 (10th Cir. 1993); see e.g., Capstick v. Allstate Ins. Co., 998 F.2d 810 (10th Cir. 1993) (inadequate investigation where insurer withheld information from expert and did not examine scene of accident); Alsobrook v. Nat'l. Travelers Life Ins. Co., 852 P.2d 768 (Okla. App. 1992) (inadequate investigation where insurer performed no investigation whatsoever). Nevertheless, an investigation need not be perfect: even a flawed investigation cannot comprise the basis of a bad faith claim if it was "reasonable under the circumstances." Bannister v. State Farm Mut. Auto Ins. Co., 692 F.3d 1117, 1132 (10th Cir. 2012) (citing Buzzard, 824 P.2d at 1109).

In the instant case, there is clearly a legitimate dispute as to coverage. First, as to accident causation and liability, as late as October 2016, when she filed her lawsuit in state court and approximately eight months after Zurich denied her claim, plaintiff still maintained that Crelia caused the accident, filing claims against him from wrongful death and negligence. Dkt. # 2-1, at 6-9 Now, in moving for summary judgment and after stipulating to Crelia's dismissal from the case with prejudice in August 2017, she admits–and predicates her claim on–Zurich's conclusion that the accident was Kirk's fault. Dkt. # 74, at 13; Dkt. 83. Although Zurich concluded in February 2016 that Kirk was at fault, it is not simply refusing to pay Magallan benefits that it acknowledges or believes it owes her. Rather, after investigating and evaluating Magallan's claim, Zurich concluded that she was not covered, a determination with which plaintiff disagrees.

Magallan premises her bad faith claim on the theory that Zurich's investigation and evaluation of her claim were inadequate. In support, she points to the following: (1) Nevin overlooked the "material fact" that Kirk was uninsured or underinsured; (2) Nevin failed to get a legal opinion that would have apprised her of Torres, and counseled her that exclusions in other

portions of the business auto coverage policy do not supplement the UM endorsement and that the direct or indirect benefit exclusion in the UM endorsement is unenforceable; and (3) Nevin failed to seek a coverage opinion from Zurich's underwriting department. Dkt # 93, at 19-27. As additional support for her bad faith claim, Magallan–with no further explanation–points the Court to the affidavit of Diane Luther. Id., at 30. In her affidavit, Luther states that Zurich "wilfully refused to discuss its position with an Oklahoma lawyer when it had identified the need to do so early on in the claims handling process." Dkt. # 93-4, at 7. Luther does not, however, point to any facts in the record to support this assertion.

Viewing the evidence in the light most favorable to Magallan, the Court finds that she fails to raise a genuine issue of material fact on the question of whether Zurich denied her claim in bad faith, and, specifically, whether Nevin's investigation was so inadequate as to rise to the level of a tort.

First, Kirk's status as uninsured or underinsured was not a material fact that Nevin overlooked–it was a determination she made based on policy interpretation. Although this Court disagrees with Nevin, and agrees with Magallan that Kirk was an underinsured, that is a legal determination based on policy interpretation, not a fact. And in 20/20 hindsight, from a legally reasoned vantage point after scores of pages of summary judgment briefing on policy interpretation (see Dkt. # 74, at 5-28; Dkt. # 79, at 4-20, 24-29; Dkt. # 88, at 1-12; Dkt. # 80, at 4-23; Dkt. # 93, at 2-19; Dkt. #98 at 2-5), Nevin was wrong. But it was not unreasonable or tortious for Nevin, a non-lawyer, to make this discretionary determination in evaluating Magallan's claim.

Second, while consulting an attorney might have led Nevin to conclude that Magallan was entitled to UM benefits, the Court cannot say that such consultation would have (and Magallan

points to no authority indicating that Nevin was required to consult an attorney). Indeed, Magallan's claim presents thorny issues of contract law and statutory interpretation that even the lawyers in this case did not explicate clearly. There is simply no way to know whether consulting an attorney would have caused Nevin to resolve the coverage issue differently.

Third, although Nevin could have consulted Zurich's underwriting department for a coverage opinion, she did consult her supervisor, who, within the company, was recognized as a "coverage champion," or expert.

Finally, although Diane Luther alleges that Zurich "wilfully refused to discuss its position with an Oklahoma lawyer when it had identified the need to do so early on in the claims handling process," Dkt. # 93-4, at 7, she points to no evidence in the record to support this assertion. Accordingly, the Court rejects this testimony for the purposes of summary judgment. Matthiesen v. Banc One Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999)("the testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact.").

In sum, Nevin's evaluation of Magallan's claim was legally wrong as a matter of policy interpretation. The evidence in the record does not, however, even suggest that her determination was made in bad faith. Magallan points to no tortious conduct of Nevin, and while her investigation could, ideally, have been more thorough, it was nevertheless reasonable under the circumstances.

**ii.**
**(No Unreasonable Delay)**

In addition to her argument that Zurich's investigation and evaluation of her claim was unreasonable, plaintiff asserts, in wholly conclusory fashion and for the first time in response to Zurich's motion for summary judgment, that a reasonable jury could find that Zurich handled her claim in bad faith based on its "delay in payment." Dkt. # 93, at 30. Although plaintiff does not develop this argument in her briefing, Diane Luther's affidavit states that Zurich's internal policy requires adjusters to conduct a coverage analysis and notify its insured in no more than thirty days, and that it took two weeks short of one year for Zurich to send a written denial on Magallan's claim. Dkt. # 93-4, at 6, 7. Zurich does not address this argument in its reply brief.

"Generally a claim or theory that is not adequately raised in the complaint and raised for the first time in response to a summary judgment motion does not properly present a claim for review." Carbajal v. City of Cheyenne, 2015 WL 9906393, at *8 (D. Wyo. Dec. 3, 2015). In a decision that predated Bell Atlantic Corp. V. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Tenth Circuit observed that the Federal Rules of Civil procedure require that a plaintiff give a defendant "fair notice" of her claims, even if every legal theory is not expressly stated in the complaint, but "[w]e do not believe, however, that the liberalized pleading rules permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d 1087 (10th Cir. 1991).

The Court has reviewed plaintiff's petition and it is clear that she has not alleged a claim against Zurich for bad faith based on unreasonable delay. Indeed, the first and only reference to this theory came at the last minute–that is, in response to Zurich's motion for summary judgment–and as a conclusory statement with no legal or factual support. In addition, plaintiff never sought leave

to amend her petition. The Court, therefore, will not allow plaintiff to proceed on her bad faith claim under a theory of unreasonable delay at this late stage of the case, as doing so would effectively undermine the pleading requirements of Twombly and Iqbal.

Accordingly, no reasonable jury could find that Nevin acted in bad faith in denying Magallan's claim, and her claim for bad faith therefore must fail.[10]

**D.**

Finally, Magallan seeks a declaratory judgment resolving any contractual disputes as to coverage and/or the amounts owed under the policy. Dkt. # 2, 1 at 5. This Court has concluded that Magallan is covered under the UM policy. Whether she recovers damages, and how much, is a jury issue at trial. Therefore, the motion for summary judgment is moot as to the request for declaratory relief.

**IT IS THEREFORE ORDERED** that Ashley Nichole Magallan's motion for partial summary judgment (Dkt. # 74) is **granted**. Her entitlement to damages, if any, is the remaining issue for the jury.

**IT IS FURTHER ORDERED** that Zurich's Daubert motion regarding plaintiff's expert Diane Luther (Dkt. # 85) is **granted in part and denied in part** as stated above.[11]

---

[10] As Magallan's claim for punitive damages would be viable only if this Court found that there were an issue of bad faith for trial, Zurich is also entitled to summary judgment on Magallan's claim for punitive damages.

[11] Ironically, because summary judgment is granted as to the bad faith claim, Luther's testimony is now irrelevant.

**IT IS FURTHER ORDERED** that Zurich's motion for summary judgment (Dkt. # 80) is **denied** as to the breach of contract claim, **granted** as to the bad faith and punitive damages claims, and moot as to the request for declaratory relief.

**DATED** this 12th day of September, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE